IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CENTRAL ALUMINUM COMPANY, on behalf of itself and all others similarly situated, | |
| | Civil Action No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| GOLDMAN SACHS GROUP, INC.; GS POWER HOLDINGS LLC; METRO INTERNATIONAL TRADE SERVICES, LLC; GLENCORE XSTRATA PLC; PACORINI METALS AG; PACORINI METALS USA LLC; JPMORGAN CHASE & CO., HENRY BATH LLC, HENRY BATH & SON LIMITED; and LONDON METAL EXCHANGE LTD, | **CLASS ACTION COMPLAINT** |
| Defendants. | |

Plaintiff Central Aluminum Company ("Plaintiff"), on behalf of itself and a proposed class of purchasers who paid artificially inflated prices for aluminum due to Defendants' collusion and manipulation of the Platts Midwest Premium, brings this action against Defendants for damages, injunctive relief and other relief pursuant to federal antitrust laws. This Complaint is based upon personal knowledge with respect to Plaintiff's own acts and upon information and belief, formed after reasonable inquiry, including the investigation of counsel, as to other matters.

## NATURE OF THE CASE

1.      This is a federal antitrust class action brought on behalf of all persons and entities (other than Defendants and their subsidiaries and affiliates) who purchased aluminum for physical delivery in the United States from January 1, 2011 through the present and paid the

Platts Midwest Premium as part of any such transaction.  Defendants are (1) banks and trading companies who own, control and operate London Metal Exchange ("LME")-certified warehouses for the storage of metals, including aluminum, (2) the companies through which the warehouses are owned and operated and (3) the LME itself, the vehicle by which the conspiracy was effectuated.

2.     Aluminum is among the most widely used non-ferrous metals.  Its applications are widespread and include everything from household and consumer electronics to automotive and aircraft fabrication.

3.     Pricing for aluminum is generally determined by way of formula rather than a negotiated price.  This formula utilizes standardized components, specifically the LME's Official Price plus a base premium ("Platts Midwest Premium" or "Midwest Premium") that incorporates the cost of freight and handling to ship aluminum from LME warehouses to the Midwest region of the United States.

4.     The LME is a metals trading exchange that also controls a large network of certified metal storage warehouses throughout the country.  Plaintiff alleges that, in violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act"), Defendants and their co-conspirators combined, conspired, or agreed with one another to restrain trade through collusively adopting and/or implementing the anticompetitive rules of the LME relating to the storage of aluminum in these LME-certified warehouses.  Defendants have engaged in this conspiracy for the purposes of building up stocks of aluminum in their warehouses while profiting off the rent charged for its storage.  These actions restrict the available supply of aluminum and artificially increase the Platts Midwest Premium, to supra-competitive levels.

5.      Defendants and their co-conspirators carried out this conspiracy by employing a number of tactics, including: (1) hoarding aluminum in LME-certified warehouses while at the same time agreeing to artificially limit the amount of aluminum that was permitted to leave these warehouses; (2) swapping supplies of aluminum between and among warehouses in transactions with other banks, hedge funds, and traders, including Defendants themselves and/or their subsidiaries and affiliates, with no legitimate economic rationale in order to bolster the appearance of scarcity and conceal the conspiracy; (3) restricting the supply of aluminum available for delivery by offering incentives for owners of aluminum to continue storing their aluminum in their warehouses rather than releasing it into the market; and (4) using the LME rule-making process as the instrumentality by which Defendants could reach anticompetitive agreements while at the same time deflecting scrutiny of their practices.

6.      The LME is a key player in this conspiracy because it oversees 719 metals warehouses around the world, including within this District, many of which house aluminum. The LME's global storage network currently holds over five million tonnes of aluminum in LME-certified warehouses worldwide, more than the amount of aluminum consumed annually in the United States.

7.      Despite these massive quantities of aluminum stored in LME warehouses, purchasers of aluminum have experienced delays of more than a year in order to receive their requested aluminum from these warehouses.  And because of the link between the LME warehouses and the broader physical market for aluminum, the Midwest Premium has risen to unprecedented levels.

8.      Instead of serving as an impartial supervisory body of the LME warehouses to ensure an efficient market for aluminum, the LME was, until recently, owned and controlled in

large part by Defendants and their co-conspirators.  The LME's aluminum warehousing rules, as implemented and administered by Defendants, functioned as a collusive agreement among Defendants and their co-conspirators.

9.      Defendants' collusive and manipulative acts took place in substantial part in the United States, and were conducted by persons and entities subject to the laws of the United States, including its states and territories and affected the pricing of millions, if not billions, of dollars' worth of aluminum purchased in the United States.

## JURISDICTION AND VENUE

10.      This action is instituted under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by virtue of Defendants' violations of § 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations.

11.      This Court has jurisdiction over the subject matter of this action pursuant to § 16 of the Clayton Act (15 U.S.C. § 26), § 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, §§ 1331 and 1337.

12.      Venue is proper in this district pursuant to § 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

13.    This Court has in personam jurisdiction over each Defendant because each

Defendant, either directly or through the ownership and/or control of its United States

subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b)

directly or indirectly sold or marketed substantial quantities of aluminum throughout the United

States, including in this District; (c) had substantial aggregate contacts with the United States as

a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that

was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of

causing injury to the business or property of persons and entities residing in, located in, or doing

business throughout the United States, including in this District.  Defendants conduct business

throughout the United States, including in this District, and they have purposefully availed

themselves of the laws of the United States.

14.    Defendants engaged in conduct both inside and outside of the United States that

caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon

interstate commerce within the United States.

15.    The activities of Defendants and their co-conspirators were within the flow of,

were intended to, and did have, a substantial effect on interstate commerce of the United States.

Defendants' products are sold in the flow of interstate commerce.

## PARTIES

16.    Central Aluminum is an Ohio corporation that is a custom producer of high

quality aluminum extrusions.  Central Aluminum's principal place of business is in Columbus,

Ohio.  Between January 1, 2011 and the present, Central Aluminum purchased aluminum,

including directly from a Defendant, and paid the Midwest Premium and, as such, suffered

antitrust injury in the form of higher prices paid for this aluminum as a result of the wrongful conduct alleged herein.

17.    Defendant Goldman Sachs Group, Inc. ("GSGI") is a global investment banking, securities and investment management firm incorporated in Delaware with its principal place of business at 200 West St., New York, New York.

18.    Defendant GS Power Holdings LLC ("GSPH") is a wholly-owned subsidiary of GSGI and is organized under the laws of Delaware with a principal place of business at 85 Broad St., New York, New York.  GSPH acquired Metro International Trade Services LLC in February 2010.

19.    Defendant Metro International Trade Services LLC ("Metro") is a business that operates LME-certified warehouses for the storage of aluminum.  It has operated as a subsidiary of GSPH since it was acquired in February 2010.  Metro is organized under the laws of Delaware and has its principal place of business at 6850 Middlebelt Road, Romulus, Michigan.

20.    Defendant JPMorgan Chase & Co. ("JPMorgan") is an investment bank and financial services firm incorporated in Delaware with its principal place of business at 270 Park Avenue, New York, New York.  JPMorgan acquired Defendant Henry Bath in July 2010.

21.    Defendant Henry Bath LLC ("Henry Bath") is a limited liability company organized under the laws of Delaware and headquartered at 2500-A Broening Highway, Baltimore, Maryland 21224.  It is a subsidiary of Henry Bath & Son, Ltd., a corporation organized under the laws of, and headquartered in, the United Kingdom.  It owns and operates numerous LME-certified warehouses in the United States that store metals, including aluminum.

22.    Defendant Glencore Xstrata PLC ("Glencore") is a multinational commodity trading and mining company organized under the laws of the United Kingdom and has its

principal place of business in Baar, Switzerland.  Glencore has more than 90 offices in 50 countries, including the United States.  In August of 2010, Glencore acquired the metals warehousing business of the Pacorini Group of Italy.

23.     Defendant Pacorini Metals AG, which is owned by Glencore, is a leading provider of LME-certified warehousing throughout the world, including the United States, where it operates through its wholly-owned subsidiary, Defendant Pacorini Metals USA ("PMUSA").

24.     Pacorini Metals USA LLC, a provider of LME warehousing and logistics services, was acquired by Glencore in September 2010.  Pacorini Metals USA LLC is incorporated in Louisiana and has its principal place of business at 5736 Citrus Blvd., Suite 104, New Orleans, Louisiana.

25.     Defendant London Metal Exchange Ltd. is a corporation organized under the laws of the United Kingdom with a principal place of business at 56 Leadenhall St., London, England. More than 80% of global non-ferrous business is transacted on the LME's platforms.  The LME regulates warehouses, holds meetings, sells future contracts and facilitates the delivery of aluminum in the United States and this District.  On July 25, 2012, LME Holdings shareholders, including Goldman Sachs and JPMorgan, approved an acquisition by Hong Kong Exchanges & Clearing Ltd.  The acquisition was completed on December 6, 2012.

## CO-CONSPIRATORS

26.     In addition, various other entities and individuals unknown to Plaintiff at this time participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and were in furtherance of, the unlawful conduct alleged herein.

27.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff, on behalf of itself and all Class members, seeks damages against Defendants based on allegations contained herein.

29.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on its own behalf and as a representative of the following class of persons and entities (the "Class"):

> All persons or entities in the United States and its territories that purchased aluminum for physical delivery and paid the Platts Midwest Premium price any time from January 1, 2011 through the present.  Excluded from the Class are Defendants, their co-conspirators, and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

30.     While Plaintiff does not know the precise number of the members of the Class, Plaintiff believes there are potentially thousands of members in the Class.  Members of the Class are so numerous that joinder is impracticable.  Class members are geographically dispersed throughout the United States.

31.     Common questions of law and fact exist as to all members of the Class.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Class, thereby making class-wide relief appropriate.  Questions of law and fact common to the Class include, but are not limited to:

> a.  Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of

aluminum, including the Platts Midwest Premium, for physical delivery sold
in the United States;

b.   The identity of the participants in the alleged conspiracy;

c.   The duration of the alleged conspiracy and the acts carried out by Defendants
and their co-conspirators in furtherance of the conspiracy;

d.   Whether the alleged conspiracy violated the Sherman Act;

e.   Whether the conduct of Defendants and their co-conspirators, as alleged in
this Complaint, caused injury to the business or property of Plaintiff and the
members of the Class;

f.   The effect of the alleged conspiracy on the prices of aluminum, including the
Platts Midwest Premium, for physical delivery sold in the United States
during the Class Period;

g.   The appropriate injunctive and related equitable relief for the Class; and

h.   The appropriate class-wide measure of damages for the Class.

32.     Plaintiff's claims are typical of the claims of the members of the Class, and
Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of
the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially
inflated prices for aluminum, including the Platts Midwest Premium, purchased during the Class
Period.

33.     Plaintiff's claims arise out of the same common course of conduct giving rise to
the claims of the other members of the Class.  Plaintiff's interests are coincident with, and not
antagonistic to, those of the other members of the Class.  Plaintiff is represented by competent
counsel who are experienced in the prosecution of antitrust and class action litigation.

34.     The questions of law and fact common to the members of the Class predominate
over any questions affecting only individual members, including legal and factual issues relating
to liability and damages.

35.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

36.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

37.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### A.     Aluminum Pricing and the Platts Midwest Premium

38.     Commercial and industrial contracts for the physical delivery of aluminum in the United States express the price for aluminum using a formula with standardized components, most notably the LME Official Price and the Platts Midwest Premium.

39.     According to the LME, the LME Official Price "is the last bid and offer price quoted during the second Ring session" and "is used as the global benchmark for physical contracts" for delivery of aluminum.  In the United States, the LME Official Price quoted for cash (the "LME Cash Price") is typically the variant used in contracts for the purchase and delivery of aluminum.

40.     The Platts Midwest Premium is meant to reflect the transport and holding costs incurred by the seller to deliver the aluminum to the Midwest region of the United States.  The Platts Midwest Premium fluctuates not only in response to changes in transport and holding costs but also in response to changing supply and demand dynamics for physical delivery of aluminum.  Notwithstanding its name, the Midwest Premium is charged throughout the United States.  It is reported by the publishing company Platts from commercial data collected from industry buyers and sellers.

**B.     Structure of the LME**

41.     According to its website, the LME "is the world centre for industrial metals trading and price-risk management.  More than 80% of global non-ferrous business is conducted here and the prices discovered on our three trading platforms are used as the global benchmark." The LME plays an even more dominant role in the trading of primary aluminum contracts in the United States, where it holds a near monopoly, as evidenced by its 96% market share with respect to primary aluminum during the Class Period.

42.     The LME's pricing of metals is, according to its website, "underpinned by a global network of approved warehouses and storage facilities as well as approved brands."

43.     The LME-certified warehouses are a critical part of the supply chain for aluminum in the United States because, among other things, it is only in these warehouses that LME delivery warrants can be issued and cancelled.

44.     Once a warehouse is approved by LME, it may issue LME warrants - documents of possession for each lot of LME-approved metal held within an LME-certified facility.  These warrants are issued by an LME-certified warehouse to a purchaser and they are used as the means of delivering metal under LME contracts.

45.     Each warrant conveys a unique lot with a specific tonnage and brand of metal to the purchaser. They are, for this reason, not interchangeable.

46.     Once a warrant is issued, the purchaser pays an LME-approved rent for storing that lot in a warehouse.  Pursuant to standardized contracts used by LME-certified warehouses, such rent is applicable for each day the aluminum is stored at such a warehouse, even if the owner has asked for physical delivery of it.

47.     The LME sets the maximum rent that can be charged for the storage of aluminum. In 2011, that rate was 42 cents per day per tonne of aluminum.  In April 2012, the maximum storage rate was increased to 45 cents and, in July 2013, the rate increased yet again to 48 cents.

48.     LME-approved warehouses accept only LME-approved brands of metal.

49.     Approximately one percent of certified warehouse rental fees go to the LME and its members.

50.     Of the LME warehouses in the United States, Goldman Sachs owns 71, Glencore owns 51, and JP Morgan owns 11.  As such, Defendants own 133 of the 159 LME-approved storage warehouses in the United States.

51.     Detroit, Michigan has become a particularly important locale for the storage of LME-certified aluminum.  In Detroit, Metro operates 29 of 37 LME-approved warehouses. Those warehouses store approximately 80% of the nation's LME aluminum supply.

52.      The LME maintains a number of committees that have delegated authority from the LME Board.  One of these committees is the Warehousing Committee, which, according to the Warehousing Committee Terms of Reference, is responsible for "keeping [the LME Executive Committee or "EXCOM"] apprised of relevant issues including industry views, changes to industry structures and other appropriate matters", "passing on to the Exchange

executive relevant complaints," "[a]ssisting the Executive, as appropriate, with the formation of working groups to advise EXCOM on warehousing issues", and "[m]aking recommendations to EXCOM on warehousing related policy issues."

53.     The Warehousing Committee is currently comprised of a chairman, vice chair and ten members.  Both Goldman Sachs/Metro and Glencore/Pacorini have representatives serving on the Warehousing Committee.

54.     Until July 2012, JPMorgan was the largest shareholder of LME Holdings, Limited, owning approximately 11% of its ordinary shares while Goldman Sachs was its second largest shareholder, with approximately 9.5% of its shares.

55.     Defendants, including the LME through its  rules and standard-setting activities, as well as other means, agreed and conspired to fix, raise, elevate, maintain, or stabilize prices of aluminum sold in interstate commerce in the United States and, in particular, by collusion and manipulation with respect to Midwest Premium as alleged herein.

**C.     Anticompetitive Conduct of Defendants**

56.     The Gramm-Leach-Bliley Act of 1999 partially repealed the Glass-Steagall Act and opened the door for financial holding companies to conduct purely commercial activities.  In 2003, the Federal Reserve again expanded banks' involvement in commerce by permitting deposit-taking banks to engage in "commodity activities that are complementary to financial activities" – in short, permitting them to seek approval to trade physical commodities.

57.     As a result, in February of 2010, Goldman Sachs, through GSPH, gained control of Metro.  The same month, JPMorgan acquired Henry Bath, another company operating LME-approved metals warehouses.  In August of 2010, Glencore acquired the Pacorini Group of Italy.

58.     The entry of these financial players into the warehousing business caused a

significant change in the behavior of the warehouses and the nature of the physical market for

aluminum.

59.     At that time, the LME required its certified warehouses to release a minimum of

1,500 tonnes of aluminum per day.  Notably, this requirement applied per company and not per

warehouse.  Therefore, if a company owned multiple warehouses in one city (for example,

Metro's 29 warehouses in Detroit), those warehouses together would need only to out-load an

aggregate of 1,500 tonnes per day.

60.     Despite the huge quantity of aluminum stored in the LME warehouses,

Defendants treated the minimum load-out rate as a maximum and barely exceeded the 1,500

tonnes per day minimum.  Similarly, after the minimum load-out rate was increased to 3,000

tonnes per day (as discussed below), the Defendants still barely exceeded this new minimum,

irrespective of market demand.  This is illustrated by the below chart for the Detroit warehouses:



61.     These rates were far lower than the rates that could have been achieved if the

Defendants operated their warehouses with the goal of efficiency, and not market manipulation.

14

It has been estimated that <u>each</u> warehouse using only two forklifts could load out as much as 1,920 tonnes per day.  Thus, the Metro warehouses in Detroit, for example, could collectively deliver far more than this minimum.

62.     As a result of these excessively (and intentionally) slow load-out rates, lengthy and persistent queues of over one year developed for delivery of aluminum as shown in the following chart.  ("Implied queue" is calculated by dividing the quantity of aluminum covered by canceled warrants by the minimum load-out rate.)



63.     In June 2011, Jorge Vazquez, Managing Director at Harbor Aluminum Intelligence, confirmed that delays of this magnitude were a recent phenomenon that coincided with the entry of companies like Goldman Sachs into the metals warehousing market.  "Before 2010, lead times in the aluminum market in North America were rarely more than a month. Suddenly, the lead-time jumped as high as 10 months.  Unprecedented lead times have produced unprecedented complaints."

64.     These complaints came from sectors throughout the economy and were focused on both the artificial scarcity of aluminum generated by Defendants' activities as well as their profiteering from the rent they charged for each day customers' aluminum was held in captive storage.  In July 2011, Nick Madden, chief procurement officer at Novelis, noted costs to the industry and to consumers as a result of Defendants' conduct.  Madden was quoted as saying that the then-seven month delays being experienced were "driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market.  It's because of an issue of accessing metal ... in Detroit warehouses."

65.     Around the same time, Dave Smith, Coca-Cola's procurement manager, noted that the situation had "been organized artificially to drive premiums up."

66.     And Anthony Lipmann, former Chairman of the Minor Metals Trade Association, testified in February of 2011 before the U.K. House of Commons' Select Committee on Science and Technology and accused the four large companies that warehouse metals of "restrictive" and "manipulative" practices.

67.     Responding to such concerns, the LME commissioned a study of warehousing policies by Europe Economics.  This study, however, was never released in full as Europe Economics noted that its report "contains a great deal of proprietary information."

68.     In the portion of the study that was made public, Europe Economics noted that long waiting times was an issue "currently . . . specific to aluminum and to one location; the LME does not have a systemic issue with its warehouse network."  It attributed this major concern in part to "the coincidental availability of surplus aluminum" and suggested that the system faced "pressure as a result of some extraordinary factors."

69.     At that time, Detroit was reportedly the only location with stockpiles exceeding 900,000 tonnes.

70.     The Europe Economics study identified a number of possible options that would have addressed the artificial supply restrictions and negated the value of Defendants' scheme. These options included "rent rebates for material that is 'stranded' in a queue" and "a significant increase in loading out rates."

71.     In response to the Europe Economics study, the LME adopted a new set of warehouse minimum load-out rules.  Under those rules, the minimum load-out requirement was linked to the amount of metal stored "in a company's warehouses at a location."  The scale did not impose any minimum requirement on warehouses individually, but provided that if a warehouse company had up to 300,000 tonnes stored in a location, it would be subject to a minimum load-out requirement of 1,500 tonnes daily.  For those companies with more than 900,000 tonnes in a location, they would be required to load-out 3,000 tonnes daily.

72.     Morgan Stanley analysts said at the time that "[t]he move is too little too late to have a material effect in the near-term on an already very tight physical market, particularly in the U.S."

73.     Again, this delivery rate imposed no requirements as to individual warehouses. So, for example, a small warehouse operator in Detroit who operated only one warehouse would be required to load-out fully half the aluminum that Metro's 29 warehouses would be required to load-out.

74.     In addition to these woefully inadequate load-out requirements, the LME addressed neither issues related to intentional delivery delays, nor did they preclude the

warehouse from simply loading out metal and shipping to another warehouse in the location to meet their requirements, a practice that was apparently rampant.

75.     A July 21, 2013 article in the *New York Times* depicts the nature of these practices.   It explained how Metro utilizes a fleet of trucks to shuffle 1,500-pound bars of aluminum among its warehouses.  Tyler Clay, a forklift driver formerly employed by Metro, called it a "merry-go-round of metal."  The article described how this works:

> On the warehouse floor, the arrangement makes for a peculiar workday, employees say.
>
> Despite the persistent backlogs, many Metro warehouses operate only one shift and usually sit idle 12 or more hours a day.  In a town like Detroit, where factories routinely operate round the clock when necessary, warehouse workers say that low-key pace is uncommon.
>
> When they do work, forklift drivers say, there is much more urgency moving aluminum into, and among, the warehouses than shipping it out.  Mr. Clay, the forklift driver, who worked at the Mount Clemens warehouse until February, said that while aluminum was delivered in huge loads by rail car, it left in a relative trickle by truck.
>
> "They'd keep loading up the warehouses and every now and then, when one was totally full they'd shut it down and send the drivers over here to try and fill another one up," said Mr. Clay, 23.
>
> Because much of the aluminum is simply moved from one Metro facility to another, warehouse workers said they routinely saw the same truck drivers making three or more round trips each day.  Anthony Stuart, a forklift team leader at the Mount Clemens warehouse until 2012, said he and his nephew — who worked at a Metro warehouse about six miles away in Chesterfield Township — occasionally asked drivers to pass messages back and forth between them.
> "Sometimes I'd talk to my nephew on the weekend, and we'd joke about it," Mr. Stuart said. "I'd ask him 'Did you get all that metal we sent you?'  And he'd tell; me 'Yep. Did you get all that stuff we sent you?' "
>
> Mr. Stuart said he also scoffed at Metro's contention that a major cause for the monthslong delays is the difficulty in locating each customer's store of metal and moving the other huge bars of aluminum to get at it.  When he arrived at work each day, Mr. Stuart's job was to locate and retrieve specific batches of aluminum from the vast stores in the warehouse and set them out to be loaded onto trucks.

"It's all in rows," he said. "You can find and get anything in a day if you want. And if you're in a hurry, a couple of hours at the very most."

76.    The ceaseless transportation of aluminum among Metro warehouses is part of a Defendant-devised strategy to create an artificial scarcity of aluminum available for physical delivery to the wider aluminum market, while simultaneously profiting from the resulting rents.

77.    At the same time, Defendants and their co-conspirators further manipulated the market by jointly offering substantial incentives to store aluminum in their warehouses and artificially restricting the removal of aluminum from those warehouses.

78.    To increase the amount of aluminum in their warehouses, the Defendants offered incentives to store aluminum in their warehouses. Metro, for example, dramatically increased its incentive payments to aluminum traders after it was acquired by Goldman Sachs. In early 2010, Metro paid incentives of $60 per tonne. Those incentives were increased to $120 per tonne by the end of 2010. In 2011, Metro offered incentives of approximately $150 per tonne. These incentives were further increased to $180 per tonne in 2012. By January 2013, Metro was paying incentives of $210 to $215 per tonne.

79.    These incentives served their intended purpose, as in Detroit alone, the amount of aluminum stored in LME-certified warehouses rose from 900,000 tons to 1.49 million tonnes between 2010 and 2012.

80.    The end result of these practices is high costs for both the owners of aluminum and end users generally. The *New York Times* estimates that the cost to manufacture 1000 beverage cans increased by $2 and the cost of the aluminum used in an average American car increased by $12. As Vazquez was quoted as saying, "[i]t's a totally artificial cost …. it's a drag on the economy. Everyone pays for it." He estimates that 90% or more of the aluminum moved at Metro each day goes to another of its warehouses.

81.     This impact was most striking with respect to the unprecedented levels of the Platts Midwest Premium.  As shown in the charts below, the Platts Midwest Premium fluctuated between four and eight cents per pound ($90-$180 per tonne) during the period of 2004 through 2008, which was characterized by robust aluminum consumption and LME Cash Prices which peaked at about $3,000 per tonne.  In the period between 2008 and 2010, during the financial crisis, recession, and subsequent tepid recovery, the Platts Midwest Premium reflected downward market pressure and fluctuated between three to six cents per pound ($65-$130 per tonne) at a time when the LME Cash Price was also much lower, fluctuating between $1,300-$2,200 per tonne.

82.     Starting in February 2011, a markedly different pattern emerged.  Economic conditions were still poor and there was a huge global surplus of aluminum.  Accordingly, the LME Cash Price began a decline from $2,600 to a recent low of $1,730.  The Platts Midwest Premium, however, moved in the opposite direction.  Beginning in February 2011, the Platts Midwest Premium spiked in three months from 6.45 cents to 8.94 cents per pound and then continued to rise during 2011 through 2013 to the recent all-time record of 12 cents per pound ($265 per tonne) in July 2013.  The Platts Midwest Premium was a little over 3% of the LME Cash Price at the height of the bull market in 2008, but is now 14% of the LME Official Price – at a time when global surpluses of aluminum have never been higher.





83.     The Platts Midwest Premium increased not only in an absolute sense but also as a

percentage of the LME Cash Price:



84.    This increase in the Platts Midwest Premium has been, and is, borne by purchasers of aluminum, and, as set forth below, is the result of Defendants' anticompetitive conduct.

85.    The continued conduct perpetrated by Defendants that resulted in customers not being able to access their own aluminum while at the same time forcing them to pay an artificially inflated Platts Midwest Premium for aluminum they were able to access led to another chorus of criticism from aluminum consumers.

86.    Tim Weiner ("Weiner"), Global Risk Manager of Commodities and Metals for Miller Coors LLC testified before the United States Senate Committee on Banking Financial Institutions and Consumer Protections on July 23, 2013 that:

> [a]luminum users like Miller/Coors are being forced to wait in some cases over 18 months to take physical delivery due to LME warehouse practices or pay the high physical premium to get aluminum today.  This does not happen with any of the other commodities we purchase.   When we buy barley we receive prompt delivery, the same with corn, natural gas and other commodities.  It is only with aluminum purchased through the LME that our property is held for an

extraordinary period of time, with the penalty of paying additional rent and premiums to the warehouse owners, until we get access to the metal we have purchased.

87.     Weiner pointed out that this issue was not unique to Miller/Coors; he said that "MillerCoors is joined in airing its concerns about the LME by a range of companies from a variety of business sectors, including The Coca-Cola Company, Novelis, Ball Corp., Rexam, Dr. Pepper Snapple Group, D.G. Yuengling Brewing Company, North America Breweries, Rogue Brewery and Reynolds Consumer Products to name just a few."

88.     Weiner went on to explain the high costs associated with these anticompetitive practices:

> The practical effect of these LME warehouse rules is to essentially create a funnel, with a wide end at entry and a very narrow end exiting out.  At the wide end, there is a massive supply of metal going into these warehouses, at the rate of tens of thousands of metric tons per day.   At the narrow end, the LME warehouses, such as those in Detroit, use minimum load-out rates as maximums, releasing no more than 3,000 MT/day.  Just imagine a warehouse with a big garage door marked "in" and the small front door of your house marked "out."  A lot more metal goes into the warehouse than comes out. U.S. manufacturers want to take possession of their metal, but cannot because the LME rules allow the warehouses to collect rent for every day, month and year that the aluminum sits in these LME warehouses.   The current system does not work.   It has cost MillerCoors tens of millions of dollars in excess premiums over the last several years with no end in sight.  My company and others estimate that last year alone, the LME warehouse rules have imposed an additional $3 billion expense on companies that purchase aluminum.

89.     The *New York Times* article stated that the "efforts by Goldman and other financial players have cost American consumers more than $5 billion over the last three years, say former industry executives, analysts and consultants."  The article also noted that before Goldman Sachs bought Metro, warehouse customers waited an average of only six weeks to have their aluminum delivered to factories.  By July 2013, it took an average of 16 months for purchasers to receive their aluminum from LME-certified warehouses.

90.     In a July 31, 2013 statement, Goldman Sachs acknowledged that "[i]n recent weeks, there has been additional focus on metals warehouses as certain end users have complained about the long wait times to get aluminum out of LME storage."  Admitting that "consumers should not have to wait unusually long times to get the metals they store in warehouses," Goldman Sachs said it would be "contacting end users to offer to swap any aluminum currently in the queue for immediately available aluminum so that they have access to the metal they need to make or package their products."

91.     Also in July, Goldman Sachs suspended the incentives it paid to encourage aluminum producers to use their warehouses, and announced that to "address any concerns that the warehouses are limiting the supply of aluminum," it would:

- "support the intent of the recently proposed rule change by the LME that will cut existing queues and prevent new queues from forming by increasing substantially the amount of daily new outflows of metal at large LME locations";

- "suggest that the LME establish a system to prioritize consumers so that they always have access to a minimum load out rate for end users"; and

- "support enhanced disclosure at the LME, including with respect to who owns the warrants for metals and to designate by broad market participant category who is in the queue."

92.     These proposals came a mere six months after Chris Evans spoke on behalf of the LME to say that the LME "is not the cause, and it cannot be the solution" to the lengthy delays.

**D.     Investigations of LME and Its Members**

93.     The activities of Goldman Sachs, Glencore, and the LME members have provoked a number of regulatory investigations.

94.     In November 2012, the European Commission indicated that it would discuss aluminum premiums and "difficulties" in receiving metal from LME warehouses.  The

Enterprise and Industry Directorate General indicated to Bloomberg that it was planning to discuss the issue with the Internal Market and Services Directorate General.

95.     During the week of July 15, 2013, the United States Commodity Futures Trading Commission ("CFTC") sent a letter to numerous banks ordering them to preserve documents relating to metals warehousing.

96.     During the following week, it was revealed that the United States Department of Justice had initiated an investigation into the metals warehousing industry following complaints that storage firms owned by Wall Street banks had inflated aluminum pricing.

97.     On July 19, 2013, the Federal Reserve Board announced it was reviewing its decision that permitted regulated banks to trade in physical commodity markets on the basis that those trades were "complementary to financial activities."

98.     The Senate Banking Committee followed with a hearing on July 23, 2013, querying whether banks should be permitted to own and control power plants, warehouses, and oil refineries.  And on July 30, 2013, Debbie Stabenow, Chairman of the United States Senate Agriculture Committee, urged the CFTC to take action.

99.     None of these investigative efforts appear to provide redress to consumers who were injured by Defendants' conduct in inflating prices of aluminum and artificially inflating aluminum costs through artificial queues.

**E.     Indicia of Agreement, Combination, or Conspiracy**

100.    As discussed above, there are numerous indicia that Defendants' conduct was not merely coincidental but carefully crafted to disturb the efficient operation of aluminum markets.

101.    The LME made repeated statements indicating that slowdowns at LME-approved warehouses were the product of abnormal market conditions and had little or no effect on end-

users.  Through Chris Evans, business development head, the LME advised that aluminum purchasers should simply decline to pay the high prices.  The LME knew when making these statements that, because of Plaintiff's own contractual agreements with end users, such action would be either impossible or economically ruinous.

102.    Defendants have each financially benefited from the anticompetitive conduct described above.  Goldman Sachs, Metro, JPMorgan, Glencore, and Pacorini all received inflated rental costs associated with treating LME load-out rules as a maximum instead of a minimum. LME received a percentage of all aluminum storage costs collected by its approved warehouses. Moreover, because LME was, until the end of 2012, owned by banks, commodities traders, and warehousers, LME's members benefited on multiple levels from this anticompetitive conduct.  In fact, more than 20% of LME Holdings (LME's parent company) was, before the 2012 sale, held by two banks that owned warehouses – JP Morgan and Goldman Sachs.

103.    Certain of the Defendants have been the subject of numerous investigations and proposed investigations, including by the European Commission, Commodity Futures Trading Commission, Federal Reserve Board, and Senate Banking Committee.

104.    The performance of the agreement guaranteed increased profits for LME and increased the potential value of LME Holdings to putative buyers.  LME members profited from this increase in value when Hong Kong Exchanges & Clearing Ltd. purchased LME Holdings for $2.15 billion.

105.    Defendants have offered coordinated and cosmetic responses to market complaints, imposing irrational and market-distorting rule changes that had the effect of increasing load-out requirements almost solely on small warehouse companies that held less than 300,000 tonnes of aluminum.

106.    Defendants have engaged in parallel conduct that would not be consistent with market forces, declining to take advantage of gross inefficiencies by competitors in the market.

107.    The parallel conduct discussed above has caused historic highs in the Platts Midwest Premium.  These peaks were achieved on the heels of a massive economic decline and despite a historic peak in aluminum in LME warehouses.

## ANTITRUST INJURY

108.    The effect of Defendants' conduct as described herein has been to artificially inflate the prices paid by Plaintiff and members of the Class for aluminum.  By reason of Defendants' violations of § 1 of the Sherman Act, Plaintiffs and the members of the Class have sustained injury.  As a direct result of Defendants' conduct, the injury sustained by Plaintiffs and the Class is the payment of supracompetitive prices for aluminum.  This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## CAUSE OF ACTION

### VIOLATION OF SECTION ONE OF THE SHERMAN ACT

109.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

110.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

111.    Beginning at least as early as January 1, 2011, and continuing thereafter, Defendants and their coconspirators entered into and engaged in a contract, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices associated with the purchase of aluminum  in violation of Section 1 of the Sherman Act (15

U.S.C. § 1).  Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

112.    The contract, combination or conspiracy consisted of an agreement, understanding or concerted action among Defendants and their co-conspirators, the substantial terms of which were:

a.      To the restrict supply of aluminum shipped out of LME-certified warehouses;

b.      To thereby increase the prices, including the Platts Midwest Premium, at which aluminum was bought in the United States; and

c.      To increase rentals that LME could obtain by wrongfully keeping stockpiles of aluminum in LME-certified warehouses so that LME could extract unjustified rental fees, including fees obtained after a customer had requested physical delivery.


113.    For the purpose of forming and carrying out the alleged contract, combination or conspiracy, Defendants and their co-conspirators did those things they conspired to do, including, among other things: (a) participating in meetings, conversations, and communications to create the aforementioned anticompetitive rules and practices; and (b) agreeing, during those meetings, conversations and communications, to take actions intended to fix the prices associated with the purchase and sale of aluminum through the LME.

114.    Defendants and their co-conspirators' contract, combination, agreement, understanding or concerted action occurred within the flow of, and substantially affected interstate commerce.

115.    As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses

and property, in amounts which are presently undetermined.  Plaintiff's injuries consist of paying higher prices for the purchase of aluminum, including the Platts Midwest Premium, through the LME than they would have paid absent Defendants' conduct.  Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from Defendants' unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter Judgment on its behalf and on behalf of the Class herein, respectfully requests the following relief:

A.     That the Court determines this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class Representative and its counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a per se violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein.

E.     That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiff and members of the Class be awarded pre-judgment and post-

judgment interest, and that such interest be awarded at the highest legal rate from and after the

date of service of the initial complaint in this action; and

G.      That Plaintiff and members of the Class receive such other or further relief as may

be just and proper.

### JURY DEMAND DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

the claims asserted in this Complaint so triable.


Dated: November 21, 2013                          Respectfully Submitted,

                                                  THE GOOGASIAN FIRM, P.C.


                                                  By_____/s/ Dean M. Googasian
                                                     Thomas H. Howlett (P57346)
                                                     Dean M. Googasian (P53995)
                                                  6895 Telegraph Road
                                                  Bloomfield Hills, MI  48301-3138
                                                  Telephone:  (248) 540-3333
                                                  Facsimile:  (248) 540-7213
                                                  thowlett@googasian.com
                                                  dgoogasian@googasian.com

                                                  Vincent J. Esades
                                                  James Anderson
                                                  **HEINS MILLS & OLSON, PLC**
                                                  310 Clifton Avenue
                                                  Minneapolis, MN  55403
                                                  Telephone: (612) 338-4605
                                                  Facsimile:   (612) 338-4692
                                                  vesades@heinsmills.com
                                                  janderson@heinsmills.com

Brian C. Gudmundson
Anne T. Regan
**ZIMMERMAN REED, PLLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:     (612) 341-0400
Facsimile:      (612) 341-0844
brian.gudmundson@zimmreed.com
anne.regan@zimmreed.com

Joseph Saveri
**JOSEPH SAVERI LAW FIRM**
505 Montgomery Street
Suite 625
San Francisco, CA 94111
Telephone:     (415) 500-6800
Facsimile:      (415) 395-9940
jsaveri@saverilawfirm.com

Brant Rhoad
**SCHERNER & SYBERT, LLC**
153 SOUTH LIBERTY STREET
POWELL, OH 43065
Telephone:     (614) 785-1700
Facsimile:      (614) 785-0700
brant@brantrhoad.com

Daniel R. Karon
**GOLDMAN SCARLATO KARON &
PENNY, P.C.**
700 West St. Clair Avenue
Suite 200
Cleveland, OH 44113
Telephone:     (216) 622-1851
Facsimile:      (216) 241-8175
karon@gskplaw.com

Adam E. Crowell
**COOPER & ELLIOTT, LLC**
2175 Riverside Drive
Columbus, OH 43221
Telephone:     (614) 481-6000
Facsimile:      (614) 486-0091
adamc@cooperelliott.com

ATTORNEYS FOR PLAINTIFFS